IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-654

 No. COA21-285

 Filed 7 December 2021

 Rockingham County, No. 20 JA 108

 IN THE MATTER OF R.B.

 Appeal by Respondent from order entered 1 February 2021 by Judge Erica S.

 Brandon in Rockingham County District Court. Heard in the Court of Appeals 6

 October 2021.

 Lisa Anne Wagner for Respondent-Appellant-Mother.

 Stam Law Firm, PLLC, by R. Daniel Gibson, for Guardian ad Litem.

 No brief filed on behalf of Rockingham County Department of Social Services,
 Petitioner-Appellee.

 WOOD, Judge.

¶1 Respondent-Mother appeals an order adjudicating her minor child, Riley,1

 neglected and dependent and continuing non-secure custody with Rockingham

 County Department of Social Services (“DSS”). On appeal, Respondent-Mother

 contends the trial court erred in adjudicating Riley neglected and dependent and

 1 A pseudonym is used to protect the identity of the juvenile(s). See N.C. R. App. P.

 42.
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 abused its discretion in continuing non-secure custody with DSS. After careful review

 of the record and applicable law, we reverse the adjudication order.

 I. Factual and Procedural Background

¶2 Respondent-Mother has one child, Riley, born on August 15, 2017.

 Respondent-Mother has a history of depression and anxiety. In December 2019,

 Respondent-Mother was having difficulty getting Riley to sleep independently and

 called several friends and a parenting hotline for support. Respondent-Mother felt

 overwhelmed and exhausted and believed it would be best for another adult to be in

 the home until she rested. Ultimately, Respondent-Mother called 9-1-1 due to her

 exhaustion.2 Law enforcement arrived to Respondent-Mother’s residence, and “didn’t

 see a problem in the home.”

¶3 Thereafter, one of Respondent-Mother’s friends picked Riley up and kept him

 for a few days. During this time, Respondent-Mother voluntarily underwent a mental

 health evaluation and began therapy. Another friend of Respondent-Mother’s

 traveled from Baltimore to stay with Respondent-Mother “in the event that it was

 determined” Respondent-Mother needed supervision. Shortly thereafter, Riley

 returned to Respondent-Mother’s care.

 2 Respondent-Mother testified she called 9-1-1 “out of an abundance of caution,” and

 that law enforcement officers “were confused as to why [she] called them.” Respondent-
 Mother further testified that law enforcement officers did not see a problem in the home.
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

¶4 Also in December 2019, Respondent-Mother befriended Ms. D. Ms. D and her

 four-year-old daughter resided with Respondent-Mother for approximately one

 month during the Covid-19 pandemic. After Ms. D moved out of Respondent-Mother’s

 residence, Respondent-Mother had additional difficulty getting Riley to sleep

 independently. Respondent-Mother attempted to arrange respite care for Riley but

 these arrangements fell through for various reasons.

¶5 On June 7, 2020, Respondent-Mother was suffering from exhaustion and

 depression.3 Respondent-Mother texted Ms. D, “I have two black eyes4 from him

 kicking me in the head. He has been screaming and banging on the door all night

 and I have not slept in 22 hours and I swear to God I think I’m going to kill him.”

 Respondent-Mother further texted that she “want[ed] to strangle the [expletive

 omitted] lights out of him”; she“[expletive omitted] hate[d] his guts [she] hated the

 [expletive omitted] guts and [she] hope[d] he [expletive omitted] chokes a [expletive

 omitted] hate every never lets me sleep”; she “hate[d] being a mom it’s the worst”;

 and Riley “could fend for himseld [sic] and [she] wil sray [sic] in [her] room.”

 Respondent-Mother expressed her frustration to Ms. D and her feeling that no one

 understood the difficulty she was experiencing. Specifically, Respondent-Mother

 3 Respondent-Mother testified she was “deeply-depressed and sleep-deprived.”
 4 Respondent-Mother did not have two black eyes on June 7, 2020.
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 sent a text message to Ms. D stating, “Everyone keeps just telling me that it’s normal

 and I’m [sic] keep telling everybody that I literally had my hands around his throat

 because I can’t [expletive omitted] take it anymore but nobody wants to hear it.”5

¶6 Ms. D testified that she “didn’t take [Respondent-Mother’s messages]

 literally,”6 and did not believe Respondent-Mother would harm Riley or herself at the

 time she received the text messages. Respondent-Mother testified these messages

 were “hyperbole and blowing off steam.” After Respondent-Mother sent Ms. D these

 messages, Riley went to stay with Ms. D for approximately one week. Respondent-

 Mother periodically messaged Ms. D throughout the week to inquire about Riley’s

 well-being and picked Riley up on June 14, 2020. Ms. D later testified that she had

 some reservations about returning Riley to Respondent-Mother’s care, “not because

 [Ms. D] didn’t think that she could do it. [Ms. D] just didn’t think she could do it at

 that time” due to her mental state. Nonetheless, she ultimately returned Riley to the

 care of Respondent-Mother, because “she’s the mother. And ultimately, [Ms. D is]

 just another human being. It’s not for [her] to say. [She] can only have an opinion

 and that doesn’t make [her] the person who can make the decision.”

 5 Additional text messages included hyperbolic language, including that Riley

 “ripped the door off the hinges.”
 6 When asked, “[Y]ou didn’t take [Respondent-Mother] seriously about what she

 said?”, Ms. D testified “I mean, obviously, I took it as she was frustrated.” Ms. D further
 testified, “Oh no. God, no. I didn’t take it literally,” when asked if she believed Respondent-
 Mother stated she would kill Riley.
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

¶7 Shortly after Riley returned to Respondent-Mother’s care, Respondent-Mother

 and Ms. D got into an argument unrelated to Riley’s care. Around this same time,

 Ms. D was contacted by DSS, and she provided DSS with screenshots of Respondent-

 Mother’s text messages from June 7, 2020.

¶8 On June 17, 2020, social workers visited Respondent-Mother’s home.

 Respondent-Mother did not allow the social worker into her home, but allowed Ms.

 N, a community behavioral health counselor, into the residence. Ms. N spent

 approximately thirty minutes in Respondent-Mother’s residence talking to her before

 determining Respondent-Mother did not need to be involuntarily committed.

¶9 After Ms. N exited the residence, she, the social worker, and law enforcement

 remained in Respondent-Mother’s driveway discussing the visit. Ms. N, the social

 worker, and law enforcement sat in their vehicles for approximately two and a half

 hours before the social worker took non-secure custody of Riley. Riley was

 temporarily placed in foster care before returning to Respondent-Mother’s residence

 with Respondent-Mother under the supervision of his maternal grandmother.

¶ 10 After Riley was temporarily removed from Respondent-Mother’s care, she

 contacted her therapist and voluntarily underwent a psychological evaluation. Her

 therapist recommended she continue therapy and comply with all of DSS’s

 recommendations. In response to her therapist’s recommendations, Respondent-

 Mother continued therapy throughout the adjudication.
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

¶ 11 On June 17, 2020, more than a week after Respondent-Mother sent Ms. D the

 text messages, DSS filed a juvenile petition alleging Riley was a neglected and

 dependent juvenile. The adjudication hearing occurred over three days: October 12,

 2020, November 5, 2020, and December 3, 2020. On November 5, 2020, Respondent-

 Mother moved to dismiss the juvenile petition, but the court denied her motion.

 Riley’s appointed Guardian ad litem submitted a report recommending Riley be

 returned to Respondent-Mother’s care. Specifically, the Guardian ad litem reported

 In my short time as a GAL, I have not encountered another
 parent like [Respondent-Mother]. She uses appropriate
 language with her son, has displayed age-appropriate
 discipline, and overall, appears to be a very good mother.
 She repeats regularly that she wants what is best for her
 son, always. I think that extenuating circumstances of
 excessive isolation during the pandemic must be taken into
 consideration in this case.

 In every call I have with the family, [Respondent-
 Mother’s] behavior with her son is exemplary. This was
 also true during what had to be a very stressful time from
 the audio recording I listened to that was recorded by
 [Respondent-Mother] on the day that DSS removed [Riley]
 from the home. [Respondent-Mother] remained a present
 and engaged parent even as her mental health was in
 question by the DSS staff member, [Ms. N]. [Respondent-
 Mother] has stated time and time again that [Riley] comes
 first. When she feels like depression might overtake her,
 she seeks care of [Riley.] . . .

 ...

 [Respondent-Mother] appears to be directly dealing
 with her known and acknowledged mental health issues
 and HAS dealt with those issues without harm to her child
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 and of her own volition, without outside intervention,
 [f]rom her history and from her dogged determination to
 clear her name in this case, she appears to have a firm
 grasp on what being a parent means. In every single
 interaction I have had with the family, the mother is
 directly engaged with her son, pays attention to his
 requests, disciplines appropriately when necessary, and
 interacts positively with him no matter what is going on.

 Included in the record on appeal are several letters drafted by Respondent-Mother’s

 friends advocating for Riley’s return to Respondent-Mother’s care. These letters were

 drafted in June 2020 and include the following language: “The way [Respondent-

 Mother] is with [Riley] is beautiful and heartwarming. . . . She would bend over

 backwards if there was any possible threat to [Riley]”; Riley “is [Respondent-

 Mother’s] world. I know firsthand that [Respondent-Mother] is a BRILLIANT

 mother”; “I could never imagine [Respondent-Mother’s] love and ability to care for

 [Riley] would ever be argued”; and “[Respondent-Mother] is a remarkable mother:

 doting affectionate, and emotionally intuitive to her son’s needs.”

¶ 12 The trial court orally adjudicated Riley a neglected and dependent juvenile and

 proceeded to disposition on December 3, 2020. On February 1, 2021, the trial court

 entered its written adjudication and disposition order, in which it adjudicated Riley

 a neglected and dependent juvenile and found “the juvenile’s return to his/her own

 home would be contrary to the juvenile’s best interests.” The trial court continued

 non-secure custody with DSS, but placed Riley “in the home of his mother, . . . under
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 constant supervision of the maternal grandmother.” Respondent-Mother timely filed

 a written notice of appeal on February 11, 2021.

 II. Discussion

¶ 13 Respondent-Mother appeals from the adjudication and disposition order.

 In North Carolina, juvenile abuse, neglect, and dependency
 actions are governed by Chapter 7B of the General
 Statutes, commonly known as the Juvenile Code. Such
 cases are typically initiated when the local department of
 social services (DSS) receives a report indicating a child
 may be in need of protective services. DSS conducts an
 investigation, and if the allegations in the report are
 substantiated, it files a petition in district court alleging
 abuse, dependency, or neglect. The first stage in such
 proceedings is the adjudicatory hearing. . . . If the
 allegations in the petition are not proven, the trial court
 will dismiss the petition with prejudice and, if the juvenile
 is in DSS custody, returns the juvenile to the parents.

 In re A.K., 360 N.C. 449, 454-55, 628 S.E.2d 753, 756-57 (2006) (citations omitted).

 “The adjudicatory hearing shall be a judicial process designed to adjudicate the

 existence or nonexistence of any of the conditions alleged in a petition. In the

 adjudicatory hearing, the court shall protect the rights of the juvenile and the

 juvenile’s parent to assure due process of law.” N.C. Gen. Stat. § 7B-802 (2020). “The

 allegations in a petition alleging that a juvenile is abused, neglected, or dependent

 shall be proved by clear and convincing evidence.” N.C. Gen. Stat. § 7B-805 (2020).

 “Immediately following adjudication, the trial court must conduct a dispositional

 hearing.” In re A.K., 360 N.C. at 455, 628 S.E.2d at 757 (citing N.C. Gen. Stat. § 7B-
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 901 (2005)).

¶ 14 We review adjudication orders to determine “(1) whether the findings of fact

 are supported by clear and convincing evidence, and (2) whether the legal conclusions

 are supported by the findings of fact.” In re C.B., 245 N.C. App. 197, 199, 783 S.E.2d

 206, 208 (2016) (citation omitted); see also N.C. Gen. Stat. § 7B-805.

 [W]hen a trial judge sits as both judge and juror, as he or
 she does in a non-jury proceeding, it is that judge’s duty to
 weigh and consider all competent evidence, and pass upon
 the credibility of the witnesses, the weight to be given their
 testimony and the reasonable inferences to be drawn
 therefrom.

 In re Whisnant, 71 N.C. App. 439, 441, 322 S.E.2d 434, 435 (1984) (internal quotation

 marks omitted). Given the deference we give to our trial courts in non-jury

 proceedings, we do not reweigh the evidence; “the trial court’s findings of fact

 supported by clear and convincing competent evidence are deemed conclusive, even

 where some evidence supports contrary findings.” In re Helms, 127 N.C. App. 505,

 511, 491 S.E.2d 672, 676 (1997) (citation omitted) (emphasis added). “Clear and

 convincing evidence ‘is greater than the preponderance of the evidence standard

 required in most civil cases.’ ” In re Smith, 146 N.C. App. 302, 304, 552 S.E.2d 184,

 186 (2001) (citation omitted). “It is defined as evidence which should fully convince.”

 Id. (citation and internal quotation marks omitted).

¶ 15 “Unchallenged findings are binding on appeal.” In re C.B., 245 N.C. App. at
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 199, 783 S.E.2d at 208 (citing In re C.B., 180 N.C. App. 221, 223, 636 S.E.2d 336, 337

 (2006), aff’d, 361 N.C. 345, 643 S.E.2d 587 (2007)). The court’s “conclusions of law

 are reviewed de novo.” In re. D.H., 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006)

 (citation omitted). A disposition order is reviewed to determine whether the trial court

 abused its discretion in deciding what action is in the juvenile’s best interest. In re

 C.W., 182 N.C. App. 214, 219, 641 S.E.2d 725, 729 (2007).

¶ 16 The Juvenile Code provides that adjudication orders “shall contain appropriate

 findings of fact and conclusions of law.” N.C. Gen. Stat. § 7B-807(b) (2020). Rule 52

 of our rules of civil procedure mandates that the trial court make findings of “facts

 specially and state separately its conclusions of law thereon. . . .” N.C. Gen. Stat. §

 1A-1, Rule 52. “[T]he trial court’s factual findings must be more than a recitation of

 allegations. They must be the specific ultimate facts . . . sufficient for the appellate

 court to determine that the judgment is adequately supported by competent

 evidence.” In re Anderson, 151 N.C. App. 94, 97, 564 S.E.2d 599, 602 (2002) (citing

 Montgomery v. Montgomery, 32 N.C. App. 154, 156-57, 231 S.E.2d 26, 28 (1977)).

¶ 17 It is “not per se reversible error for a trial court’s fact findings to mirror the

 wording of a petition or other pleading prepared by a party. . . . [T]his Court will

 examine whether the record of the proceedings demonstrates that the trial court,

 through processes of logical reasoning, based on the evidentiary facts before it, found

 the ultimate facts necessary to dispose of the case.” In re J.W., 241 N.C. App. 44, 48-
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 49, 772 S.E.2d 249, 253, disc. review denied, 368 N.C. 290, 776 S.E.2d 202 (2015)

 (citation omitted). “Ultimate facts are the final resulting effect reached by processes

 of logical reasoning from the evidentiary facts.” In re Anderson, 151 N.C. App. at 97,

 564 S.E.2d at 602 (citation omitted); see also In re H.J.A., 223 N.C. App. 413, 418, 735

 S.E.2d 359, 363 (2012) (citation omitted).

 A. Adjudication of Neglect

¶ 18 Respondent-Mother first argues the trial court erred in adjudicating Riley a

 neglected juvenile. We agree.

 The purpose of the adjudication hearing is to determine the
 existence of the juvenile’s conditions as alleged in the
 petition. In re A.B., 179 N.C. App. 605, 609, 635 S.E.2d 11,
 14 (2006); N.C. Gen. Stat. § 7B-802 (2015). At this stage,
 the court’s decisions must often be ‘predictive in nature, as
 the trial court must assess whether there is a substantial
 risk of future abuse or neglect of a child based on the
 historical facts of the case.’

 In re E.P.-L.M., 272 N.C. App. 585, 593, 847 S.E.2d 427, 434 (2020) (quoting In re

 McLean, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999)). Section 7B-101(15) of

 our general statutes defines a “neglected juvenile” as “[a]ny juvenile . . . whose parent

 . . . does not provide proper care, supervision, or discipline . . . or who lives in an

 environment injurious to the juvenile’s welfare.” N.C. Gen. Stat. § 7B-101(15) (2020).

 To adjudicate a juvenile neglected, “some physical, mental, or emotional impairment

 of the juvenile or a substantial risk of such impairment as a consequence of the failure
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 to provide proper care, supervision, or discipline” is required. In re Safriet, 112 N.C.

 App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (citation and internal quotation marks

 omitted); In re C.M., 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (citation

 omitted); In re E.P.-L.M., 272 N.C. App. at 596, 847 S.E.2d at 436 (citation omitted).

 “Similarly, in order for a court to find that the child resided in an injurious

 environment, evidence must show that the environment in which the child resided

 has resulted in harm to the child or a substantial risk of harm.” In re K.J.B., 248

 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (citation omitted). In adjudicating a

 child neglected, “the circumstances and conditions surrounding the child,” not “the

 fault or culpability of the parent,” are “what matters.” In re Z.K., 375 N.C. 370, 373,

 847 S.E.2d 746, 748-49 (2020) (citation omitted).

¶ 19 Here, the trial court’s order is in a “check box” format, in which the trial court

 “checked” the following findings of fact:

 12. After receiving evidence, the Court finds: facts as
 alleged in the Juvenile Petition which was filed by [DSS]
 and which appears in the juvenile’s court file. Said copy of
 the Juvenile Petition is incorporated herein by reference
 and its allegations are found as fact by the Court. These
 facts are also set out in the attached page or pages (entitled
 “Additional Findings of Fact”).

 ...

 13. The juvenile, [Riley,] is neglected, in that the juvenile .
 . . lives in an environment injurious to the juvenile’s
 welfare. . . . The juvenile is at risk of future abuse, neglect
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 or dependency.

 In the trial court’s “Additional Findings of Fact,” the court recites, verbatim, the

 allegations of the juvenile petition. Respondent-Mother challenges the following

 facts contained therein:

 On or about June 14, 2020, [DSS] received a neglect report
 on the minor child based on injurious environment.
 Specifically, the reporter was concerned over the safety of
 the minor child based on the mother’s mental health. The
 child was placed in the care of [Ms. D] by the mother
 because the mother was having a mental health crisis.
 After a couple of days, [Ms. D] attempted to return the child
 to the mother, but the mother refused to take the child. . .
 . The mother asked a friend for help in trying to find the
 child an adoptive home. The mother finally picked the child
 up from [Ms. D] on Sunday.

 . . . The mother is refusing to cooperate with the [social
 worker]. The mother would only speak to [the social
 worker] through the screen door. The [social worker] could
 see the minor child inside the home. The mother did
 willingly let [Ms. N] into the home so that [Ms. N] could
 assess the mother’s mental health. The mother is refusing
 to make a plan of care for the minor child as the mother
 states the child is safe. The mother advised the [social
 worker] that the mother is not cooperating because the
 [social worker] is a bully and a liar.

 The mother has CPS history based on her mental health
 issues. . . .

¶ 20 The trial court’s findings of fact regarding the alleged “injurious environment”

 are limited to those regarding Respondent-Mother’s mental health. The trial court

 made no factual findings regarding any prior harm Riley suffered, nor did it make
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 any findings regarding a substantial risk of harm. In re K.J.B., 248 N.C. App. at 354,

 797 S.E.2d at 518. (citation omitted). “Where there is no finding that the juvenile has

 been impaired or is at substantial risk of impairment, there is no error if all the

 evidence supports such a finding.” In re Padgett, 156 N.C. App. 644, 648, 577 S.E.2d

 337, 340 (2003) (citation omitted); see also In re K.J.B., 248 N.C. App. at 354, 797

 S.E.2d at 518 (“A trial court’s failure to make specific findings regarding a child’s

 impairment or risk of harm will not require reversal where the evidence supports

 such findings.” (citation omitted)).

¶ 21 Although the trial court made findings regarding Respondent-Mother’s mental

 health and Ms. D’s fear for Riley’s wellbeing, many of these findings are unsupported

 by competent evidence. For example, the trial court found that Respondent-Mother

 refused to make a plan of care for Riley, but the evidence showed that Respondent-

 Mother had an established Temporary Safety Plan (“TSP”) that she did not feel she

 needed to activate. The court further found Ms. D attempted to return Riley to

 Respondent-Mother’s care and Respondent-Mother refused; however, Ms. D testified

 she did not tell DSS that she attempted to return Riley to Respondent-Mother’s care

 prior to June 14, 2020.

¶ 22 Finding of fact 12 merely incorporates the allegations contained in Exhibit A

 as factual findings. Although it is “not per se error for a trial court’s fact findings to

 mirror the wording of a petition,” the trial court is mandated to find “the ultimate
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 facts necessary to dispose of the case.” In re J.W., 241 N.C. App. at 48-49, 772 S.E.2d

 at 253 (citation omitted). As the evidence presented tended to contradict the

 allegations in the petition, we hold the trial court’s findings of fact regarding the

 alleged neglect are unsupported by competent evidence. See In re Anderson, 151 N.C.

 App. at 97, 564 S.E.2d at 602 (“[T]he trial court’s . . . findings must be more than a

 recitation of allegations.”); In re O.W., 164 N.C. App. 699, 702, 596 S.E.2d 851, 853

 (2004) (citation omitted). Further, the trial court’s fact findings also include, “See

 Exhibit B which is incorporated by reference.” “Exhibit B” is not attached to the

 order. It is clear the trial court’s findings are no “more than a recitation of the

 allegations” contained in Exhibit A, as the language is identical. The trial court failed

 to make its own ultimate findings of facts.

¶ 23 Moreover, the trial court did not make any factual findings regarding the

 injurious environment in which it believed Riley resided. The evidence tends to show

 that the only alleged “threats of harm to the child” made by Respondent-Mother were

 in the text messages she sent to Ms. D; however, both the sender and the receiver of

 the texts testified that they neither meant nor took the texts literally. Although not

 required to do so, the trial court did not address the approximately ten-day long time

 frame between Respondent-Mother’s text messages and DSS intervention. We

 emphasize, “in order for a court to find that the child resided in an injurious

 environment, evidence must show that the environment in which the child resided
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 has resulted in harm to the child or a substantial risk of harm.” In re K.J.B., 248 N.C.

 App. at 354, 797 S.E.2d at 518 (citation omitted) (emphasis added). There is no

 evidence in the record before us that Riley suffered prior harm while in the care of

 Respondent-Mother. The trial court made no factual findings regarding substantial

 risk of future harm to Riley; rather it impermissibly adopted DSS’s allegation that

 Respondent-Mother “made threats of harm toward the child.” Where both parties

 testified at trial that the texts were not meant literally when sent nor taken literally

 when received, we decline to hold that the text messages Respondent-Mother sent to

 Ms. D standing alone, constitute clear and convincing evidence of a substantial risk

 of harm toward Riley. While we agree the trial court is in a better position to

 determine the credibility of the witnesses than the appellate court is based on the

 cold record, see In re Whisnant, 71 N.C. App. at 441, 322 S.E.2d at 435, when, as here,

 the trial court fails to make the ultimate findings of fact necessary to dispose of the

 case or support the conclusion that Riley is a neglected juvenile, we must reverse the

 adjudication order and remand to the trial court.

¶ 24 This Court reversed an adjudication of neglect and abuse where the mother

 sent a friend “Yahoo” messages about killing her children. See In re L.L., No. COA11-

 1460, 220 N.C. App. 416, 2012 WL 1514870, at *1, 4 (unpublished). Specifically, the

 mother sent messages stating, “i need a break from it all”; “im about to fukn lose it”;

 and “ima fukn kill em both.” Id. at *1. During her psychiatric evaluation, the mother
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 “told the physician she made the threatening statements because she was ‘severely

 stressed’ and thought she could ‘vent’ to her best friend.” Id. In reversing the

 adjudication order, this Court reasoned, “[t]he evidence does show that the mental

 health professional who examined [the mother] for involuntary commitment found

 that [the mother] displayed no evidence of a desire to harm herself or her children,”

 and the messages were “written three weeks earlier while [the mother] was ‘venting’

 to a friend.” Id. at *4.

¶ 25 Likewise, in In re A.O.T., No. COA19-168, 268 N.C. App. 323, 2019 WL

 5726809, this Court vacated an adjudication of neglect where the mother “shook the

 bassinet in which the baby was contained” and feared “she was going to hurt the

 child”; the mother admitted she “scream[ed] and curs[ed] at the child”; and the

 mother sent text messages to the child’s father in which she stated, “I shook him

 again cause he’s being [expletive omitted] annoying” and “I [expletive omitted] hate

 him . . . I’m about to throw him/ I will [expletive omitted] kill him.” Id. at *3. There,

 the trial court made further findings regarding the mother’s post-partum depression

 and messages that she hit the baby and “threw him off” her. Id. Although the mother

 “did not actually” harm the child, “she wanted the . . . father to think that she actually

 had shaken the baby.” Id. This Court vacated the adjudication order, stating, “[T]he

 [trial] court made no finding of any ‘physical, mental, or emotional impairment of the

 juvenile or a substantial risk of such impairment’ as required by our case law.” Id.
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 (citations omitted). In vacating the adjudication, this Court reasoned that, “in light

 of [the] [m]other’s testimony that her text messages to [the] [f]ather were not true

 and merely an attempt to get his attention, we cannot say ‘all the evidence supports

 . . . a finding’ that [the juvenile] was either harmed or at a substantial risk of harm

 in his mother’s care.” Id. at *4 (citation omitted). We find the reasoning in In re L.L.,

 and In re A.O.T., persuasive and adopt it herein.

¶ 26 In the present appeal, Respondent-Mother sent text messages to a close friend,

 messages which Ms. D testified she “didn’t take literally.” Respondent-Mother

 testified she was “venting,” “blowing off steam,” and that the messages were

 hyperbole and exaggeration. Respondent-Mother had a history of anxiety and

 depression, and stated she was “deeply-depressed and sleep-deprived” at the time the

 messages were sent. More than a week passed from the time Respondent-Mother

 sent the text messages until DSS arrived at the residence to evaluate Respondent-

 Mother for involuntary commitment. Ms. N, the community behavioral health

 counselor who questioned Respondent-Mother about her mental health, did not

 believe Respondent-Mother should be involuntarily committed. If Ms. N had

 determined that Respondent-Mother posed a danger to herself or others, she would

 have presumably recommended Respondent-Mother be involuntarily committed.

 Other evidence presented showed that Respondent-Mother was aware of her mental

 health needs and sought assistance and respite care for her child when she believed
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

it to be necessary. The trial court made no factual findings regarding whether Riley

was harmed in his mother’s care or whether there was a substantial risk that he

would be harmed. Accordingly, we “cannot say ‘all the evidence supports a finding

that [Riley] was either harmed or at a substantial risk of harm in his mother’s care.”

See id.; see also In re L.L., 2012 WL 1514870, at *4; In re T.X.W., No. COA 17-855,

258 N.C. App. 204, 2018 WL 944766 (reversing an adjudication of neglect and

dependency where the mother was diagnosed with mental illness and believed her

friend was plotting to have DSS take the children away where “there was no evidence

that [the minor children] were actually harmed or faced a substantial risk of harm

while in [the mother’s] care.”). Based on the review of the cold record, we are not

persuaded that the evidence presented at the hearing rises to the level of such

evidence that would “fully convince” a fact finder that Riley suffered harm or a

substantial risk of harm in his mother’s care. However, we recognize that the trial

court is in a better position to determine the credibility of the witnesses and to resolve

the inconsistencies in the evidence. Because the trial court did not make the ultimate

findings of fact regarding the risk of harm Riley faced, we remand to the trial court

for the court to make any additional findings of fact which may support its conclusion

that Riley is a neglected juvenile or for the trial court to dismiss the petition in

absence of such findings.

B. Adjudication of Dependency
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

¶ 27 Respondent-Mother further contends the trial court erred in adjudicating Riley

 dependent. We agree.

¶ 28 A “dependent juvenile” is one whose “parent, guardian, or custodian is unable

 to provide for the juvenile’s care or supervision and lacks an appropriate alternative

 child care arrangement.” N.C. Gen. Stat. § 7B-101(9). An adjudication of dependency

 requires the trial court to “address both (1) the parent’s ability to provide care or

 supervision, and (2) the availability to the parent of alternative child care

 arrangements.” In re P.M., 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005).

 “Findings of fact addressing both prongs must be made before a juvenile may be

 adjudicated as dependent, and the court’s failure to make these findings will result

 in reversal of the court.” In re L.C., 253 N.C. App. 67, 80, 800 S.E.2d 82, 91-92 (2017)

 (citation omitted); In re B.M., 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007).

¶ 29 Regarding dependency, the trial court made the following findings of fact:

 12. After receiving evidence, the Court finds: facts as
 alleged in the Juvenile Petition which was filed by [DSS]
 and which appears in the juvenile’s court file. Said copy of
 the Juvenile Petition is incorporated herein by reference
 and its allegations are found as fact by the Court. These
 facts are also set out in the attached page or pages (entitled
 “Additional Findings of Fact”).

 ...

 13. . . . The juvenile, [Riley], is dependent, in that the
 juvenile needs assistance or placement because the
 juvenile has no parent, guardian, or custodian responsible
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

 for the juvenile’s care or supervision. [T]he juvenile’s
 parent, guardian, or custodian is unable to provide for the
 juvenile’s care or supervision and lacks an appropriate
 alternative child care arrangement.

 In the trial court’s additional findings, the court found that “[t]he child is dependent

 in that he does not have a parent who is capable of providing safe care or supervision

 to the child.”

¶ 30 After careful review, we hold finding of fact 13 is more appropriately classified

 as a conclusion of law. See In re Helms, 127 N.C. App. at 510, 491 S.E.2d at 675 (“As

 a general rule, . . . any determination requiring the exercise of judgment . . . or the

 application of legal principles . . . is more properly classified a conclusion of law.”

 (citations omitted)). Accordingly, the only finding of fact regarding Riley’s alleged

 dependency is the trial court’s additional finding that Riley “does not have a parent

 who is capable of providing safe care or supervision.” This finding, however, does not

 address the second prong of a dependency determination. The trial court’s order is

 devoid of factual findings regarding an alternative child care arrangement. We note,

 however, that there is evidence in the record from multiple sources that Respondent-

 Mother sought respite care for the minor child as she believed necessary.

 Consequently, we reverse the adjudication of dependency for the trial court’s failure

 to consider the second prong.

 III. Conclusion
 IN RE R.B.

 2021-NCCOA-654

 Opinion of the Court

¶ 31 After careful review, we reverse the adjudication order finding the juvenile to

 be a neglected and dependent juvenile. We remand to the trial court for additional

 findings of fact to support the trial court’s finding of neglect or for the trial court to

 dismiss the petition in the absence of such findings. Because we reverse the

 adjudication order, we need not address the dispositional order.

 REVERSED AND REMANDED.

 Judge ZACHARY concurs.

 Judge CARPENTER concurs in part and concurs in result only in part by

 separate opinion.
 No. COA21-285– In re R.B.

 CARPENTER, Judge, concurring in part and concurring in result only in part.

¶ 32 I fully concur with the majority’s conclusion with respect to the issue of

 adjudication of dependency. I respectfully concur in result only on the issue of neglect

 adjudication, and I write separately to differentiate my reasoning from that of the

 majority in reaching the decision to reverse and remand. Regarding the trial court’s

 adjudication of neglect, I agree with the majority’s holding that “[t]he trial court made

 no factual findings regarding whether Riley was harmed in his mother’s care or

 whether there was a substantial risk that he would be harmed.” See In re K.J.B.,

 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (“[I]n order for a court to find that

 the child resided in an injurious environment, evidence must show that the

 environment in which the child resided has resulted in harm to the child or a

 substantial risk of harm.”) (citation omitted). I further agree the trial court failed to

 “f[ind] the ultimate facts necessary to dispose of the case” “through processes of logical

 reasoning.” See In re J.W., 241 N.C. App. 44, 48–49, 772 S.E.2d 249, 253, disc. rev.

 denied, 368 N.C. 290, 776 S.E.2d 202 (2015) (citation omitted). Instead, the trial court

 simply recited verbatim the allegations from DSS’s petition. See In re M.K., 241 N.C.

 App. 467, 470–71, 773 S.E.2d 535, 538–39 (2015). However, for the following reasons,

 I disagree with the analysis of the majority opinion with respect to whether there is

 sufficient evidence in the record for the trial court to find Riley resided in an injurious

 environment.
 IN RE R.B.

 2021-NCCOA-654

 CARPENTER, J., concurring in part and concurring in result only in part.

¶ 33 This Court reviews a trial court’s adjudicatory decision “to determine whether

 the findings are supported by clear, cogent and convincing evidence and the findings

 support the conclusions of law.” In re E.H.P., 372, N.C. 388, 392, 831 S.E.2d 49, 52

 (2019) (citation omitted). “A trial court’s finding of fact that is supported by clear,

 cogent, and convincing evidence is deemed conclusive even if the record contains

 evidence that would support a contrary finding.” In re B.O.A., 372 N.C. 372, 379, 831

 S.E.2d 305, 310 (2019) (citation omitted).

¶ 34 As an initial matter, I note the trial court was not required to making findings

 of fact regarding the credibility of witnesses or resolve inconsistences in the

 evidence—the trial court was required to “find the ultimate facts essential to support

 the conclusions of law.” See In re J.W., 241 N.C. App. at 48, 772 S.E.2d at 253.

¶ 35 The majority appears to decline to hold there is sufficient evidence in the record

 that would permit the trial judge to find the child suffered a substantial risk of harm

 in his mother’s care by weighing the evidence and assessing the credibility of the

 witnesses presented at trial. It is not this Court’s role to weigh evidence and

 determine the credibility of witnesses. See In re Whisnant, 71 N.C. App. 439, 441,

 322 S.E.2d 434, 435 (1984) (“[I]t is [within the trial court] judge’s duty to weigh and

 consider all competent evidence, and pass upon the credibility of the witnesses, the

 weight to be given their testimony and the reasonable inferences to be drawn
 IN RE R.B.

 2021-NCCOA-654

 CARPENTER, J., concurring in part and concurring in result only in part.

 therefrom.”) (citing Knutton v. Cofield, 273 N.C. 355, 160 S.E.2d 29 (1968)). By doing

 so, it appears this Court is stepping into the shoes of the trial court judge.

¶ 36 Seemingly disregarded by the majority is record evidence and the plain

 language of text messages that were received in evidence in which Respondent-

 Mother admits to taking a step toward harming the child—which was consistent with

 her threats. In her text messages, Respondent-Mother stated, inter alia, she:

 “want[ed] to strangle the [expletive omitted] lights out of [her child],” was “going to

 have to abandon him,” was “going to hurt him,” was “going to kill him” and “literally

 had [her] hands around his throat.” (Emphasis added). The majority declines to

 conclude these text messages could be found by the trial judge to be clear and

 convincing evidence that Riley was at a substantial risk of harm based on the

 Respondent-Mother’s and Ms. D’s testimony. Rather, the majority appears to re-

 weigh evidence and determine witness credibility, as evidenced by the majority’s

 description of Respondent-Mother’s text messages as including “hyperbolic language”

 and its presumption that Respondent-Mother did not pose a substantial risk of harm

 to Riley because Respondent-Mother was not involuntarily committed following

 DSS’s evaluation.

¶ 37 I note the record also includes testimony of Ms. D on 12 October 2020 that she

 “absolutely” had reservations about returning Riley to the care of his mother after

 Respondent-Mother agreed to place Riley in a “safe home” through a foster care
 IN RE R.B.

 2021-NCCOA-654

 CARPENTER, J., concurring in part and concurring in result only in part.

 program. Ms. D was hesitant to return the child to Respondent-Mother “because

 [she] didn’t think that [Respondent-Mother] could [care for the child]” based on “all

 the stuff she said and texted [her] and telling [her] that [she] was trying to find [Riley

 a home].” The majority focuses its attention on testimony provided by Ms. D at the

 second adjudication hearing, held over three weeks later, on 5 November 2020. At

 the 5 November hearing, Ms. D testified she “didn’t take [Respondent-Mother’s text

 message in which she stated she was going to kill Riley] literally.” However, the

 majority notes on multiple instances Ms. D “didn’t take literally” Respondent-

 Mother’s text messages. This statement by the majority takes Ms. D’s testimony out

 of context since her response at the hearing only pertained to the text messages in

 which Respondent-Mother stated she was going to kill Riley—not to the text message

 string in general. Also, the majority’s emphasis on Ms. D’s testimony in which she

 testified she did not take Respondent-Mother’s text messages “literally,” conflicts

 with the other evidence of record, including Ms. D’s earlier testimony. The majority’s

 emphasis on certain evidence, while being dismissive of other evidence, necessarily

 demonstrates its undertaking of determining witness credibility and the weight to be

 given to the evidence—a role reserved for the trial judge and not this Court. See In

 re Whisnant, 71 N.C. App. at 441, 322 S.E.2d at 435.

¶ 38 Similarly, the majority appears to hold that the text messages could not be

 clear and convincing evidence of a substantial risk of harm toward Riley based in part
 IN RE R.B.

 2021-NCCOA-654

 CARPENTER, J., concurring in part and concurring in result only in part.

 on Respondent-Mother’s own testimony at the adjudication hearing in which she

 testified she was only “venting” in her “hyperbolic” text messages to Ms. D. This

 reasoning again involves determining witness credibility and evidence weight, which

 was solely within the province of the trial court. See In re Whisnant, 71 N.C. App. at

 441, 322 S.E.2d at 435.

¶ 39 Finally, the majority relies heavily on unpublished opinions of this Court in

 considering whether the trial court’s neglect adjudication was based on sufficient

 findings of fact or sufficient evidence. As this Court has previously noted, “a parent’s

 conduct in a neglect determination must be viewed on a case-by-case basis

 considering the totality of the evidence.” In re L.T.R., 181 N.C. App. 376, 384, 639

 S.E.2d 122, 128 (2007). In the instant case, the evidence included, inter alia,

 testimony by Respondent-Mother in which she describes calling 911 “to make sure

 that there would be another adult [at her home],” testimony by witnesses including

 Ms. D, and multiple text messages sent by Respondent-Mother to Ms. D in which

 Respondent-Mother threatened to harm Riley. Accordingly, I would hold there was

 sufficient evidence in the record for the trial court to make a finding Respondent-

 Mother posed a “substantial risk of [physical] impairment” to Riley “as a consequence

 of [her] failure to provide proper care . . . .” See In re Safriet, 112 N.C. App. 747, 752,

 436 S.E.2d 898, 901–02 (1993). Since the trial court failed to make such a finding, I

 would conclude the trial court’s findings were insufficient under N.C. Gen. Stat. § 7B-
 IN RE R.B.

 2021-NCCOA-654

 CARPENTER, J., concurring in part and concurring in result only in part.

 101(15) (2019) to support a conclusion of law that Riley was a neglected juvenile.

 Therefore, I agree with the majority’s decision to reverse the trial court’s adjudication

 of neglect and remand to the trial court to make additional findings of fact regarding

 “the existence or nonexistence of any of the conditions alleged in [DSS’s] petition.”

 See In re V.B., 239 N.C. App. 340, 344, 768 S.E.2d 867, 869–70 (2015); In re H.J.A.,

 223 N.C. App. 413, 419, 735 S.E.2d 359, 363 (2012) (stating our Court “must reverse

 the trial court’s order” where there is sufficient evidence in the record to support a

 finding, yet the trial court failed to make such a finding).

¶ 40 For the reasons stated above, I fully concur with the majority opinion on the

 issue of the dependency adjudication. I disagree with the majority’s reasoning with

 respect to the issue of the neglect adjudication, and therefore, I respectfully concur in

 result only with the majority’s opinion on this issue.